# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-1914V
UNPUBLISHED

| | |
|---|---|
| SARAH GRIFFORE,<br><br>               Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: April 5, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*David Carney, Green & Schafle LLC, Philadelphia, PA,* for Petitioner.

*Catherine Stolar, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On December 18, 2019, Sarah Griffore filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she received an influenza ("flu") vaccine on January 31, 2019, and subsequently suffered a left shoulder injury related to vaccine administration (SIRVA). Petition at 1-2. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$66,491.20**, **representing $65,000.00 for actual pain and suffering, and $1,491.20 for past unreimbursable expenses.**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I.      **Relevant Procedural History**

As noted, this case was initiated in December 2019. On June 11, 2021, Respondent filed his Rule 4(c) report conceding that Petitioner was entitled to compensation. ECF 27. A ruling on entitlement was issued that same day. ECF 28. One month later, the parties reported an impasse on the issue of Petitioner's pain and suffering.[3] ECF 31. Both parties subsequently filed briefs on this issue, and the matter is now ripe for adjudication.

II.     **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is

---

[3] In that same status report, the parties indicated that they had reached agreement on Petitioner's out-of-pocket medical expenses. ECF 31.

nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### III.    Prior SIRVA Compensation Within SPU[5]

#### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[7] Agreement |
|---|---|---|---|---|
| **Total Cases** | *88* | *1,223* | *28* | *967* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |

[6] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### IV.    Appropriate Compensation for Petitioner's Pain and Suffering

---

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

In this case, awareness of the injury is not disputed. The record reflects that Petitioner is a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury in determining the appropriate pain and suffering award.

In performing this analysis, I have reviewed the record as a whole, including all medical records and affidavits filed, as well as the parties' briefs and other pleadings. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I have based my ultimate determination on the specific circumstances of this case.

## A. The Parties' Arguments

The parties agree Petitioner should be awarded $1,491.20 in unreimbursed medical expenses. ECF 32 at 19; ECF 35 at 5. Thus, the only area of disagreement concerns the amount of compensation that should be awarded for Petitioner's pain and suffering.

In arguing that she should be awarded $80,000.00 for her pain and suffering, Petitioner compares the facts and circumstances in her case favorably with the experiences of the petitioners in *Pruett*, *Capasso*, *Kim*, and *Marino*, all of whom received awards of $75,000.00.[9] ECF 32 at 12-14. She asserts that a slightly higher award is appropriate, however, because she suffered with extreme pain for longer than two and a half months and had little improvement or relief of symptoms for a "long time period" thereafter. *Id*. at 14-15. She was also pregnant at the time of her SIRVA and had difficulty caring for her infant after the baby was born, similar to the petitioner in *Kim*.[10] ECF 14-15.

Characterizing Petitioner's injury as comparatively minor, requiring only conservative treatment, Respondent argues in reaction that Petitioner should receive the lesser sum of $45,000.00 for her pain and suffering. ECF 35 at 5. In reaching this conclusion, Respondent argues that the facts of Petitioner's case are more comparable

---

[9] *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for past pain and suffering); *Capasso v. Sec'y of Health & Human Servs.*, No. 17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 in actual pain and suffering); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for actual pain and suffering); *Marino v. Sec'y of Health & Human Servs.*, No. 16-0622, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for actual pain and suffering).

[10] The petitioner in *Kim* had a three-month-old infant at the time of her SIRVA. *Kim*, 2018 WL 3991022, at *1.

to those in *Ramos* and *George*, cases where the petitioners' SIRVA injuries were characterized as mild, and they received only conservative treatment.[11] *Id*. at 10.

In her responsive brief, Petitioner argues that Respondent's characterization of her case as warranting a below-median award is inaccurate. ECF 37 at 2. She emphasizes that the duration and severity of her symptoms, as well as the short time between onset of injury and when she sought treatment, distinguish her case from *Ramos* and *George*. *Id*. at 2-6. Petitioner further reiterates the similarities between her case and the cases discussed in her initial brief. *Id*. at 7-9.

### B. Analysis

The guidance provided by the *Graves* decision is clear (although not controlling),[12] and I have previously addressed the more general arguments about calculation of pain and suffering damages made by Respondent during expedited "Motions Day" hearings and in other damages decisions. I have specifically rejected Respondent's argument "that the amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded than reasoned decisions from the court and special masters." *Sakovits*, 2020 WL 3729420, at *4.

### 1. The Duration and Severity of Petitioner's SIRVA Injury

Petitioner was 16-weeks pregnant when she received the flu vaccine in her left deltoid during a routine obstetric visit on January 31, 2019. Ex 1 at 5. Four weeks later, Petitioner presented to her primary care physician, Dr. Rong Lawson, with complaints of left shoulder pain that began after her flu shot. Ex 3 at 3. At her first appointment with Dr. Lawson, Petitioner displayed decreased range of motion (ROM) of her left shoulder when "mov[ing] [her] arm forward and side way [sic]," but Petitioner was "[o]k to reach back." *Id*. at 4-5. After six sessions of occupational therapy, Petitioner continued to display "significant strength deficits;" however, she also had "near functional" range of motion in her left shoulder. Ex 1 at 115, 118. She was discharged to a home exercise program after her final visit on April 22, 2019. *Id*.

Approximately two months later, Petitioner returned to Dr. Lawson, at which time she reported that OT had helped to increase her range of motion and decrease her pain

---

[11] *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021 (awarding $40,000.00 for actual pain and suffering); *George v. Sec'y of Health & Human Servs.*, No. 18-0426V, 2020 WL 4692451 (Fed. Cl. Spec. Mstr. July 10, 2020) (awarding $67,000.00 for actual pain and suffering).

[12] *See supra* Section II (for further discussion).

level. Ex 4 at 4-5. Physical examination of Petitioner's shoulder by Dr. Lawson at this visit and at a subsequent visit in September 2019 revealed normal findings. Ex 4 at 6; Ex 5 at 4-5; Ex 10 at 334-35.

Ten months after vaccination, in December 2019, Petitioner visited Dr. Kristalyn Mauch, an orthopedist, for the first time. Ex 7 at 3. Physical examination continued to reveal normal left upper extremity strength and range of motion, except for decreased range of motion on active abduction. *Id*. at 6-7. Dr. Mauch did refer Petitioner for an MRI, which demonstrated mild edema in the subacromial/subdeltoid bursa and mild increased signal in the supraspinatus and infraspinatus tendons. Ex 8 at 11-12.

For reasons that are unclear, Petitioner did not subsequently return to Dr. Mauch, but was instead reevaluated by Lindsey Pilling, PA, at another orthopedic practice, Covenant Center for Advanced Orthopaedics (CCAO), one week after her MRI. Ex 8 at 5. At that time, Petitioner displayed decreased flexion and internal rotation but no tenderness and normal strength. *Id*. at 7. PA Pilling opined that Petitioner's MRI "look[ed] normal" (except for "some cyst formation") and that surgery would not be helpful in alleviating Petitioner's pain. *Id*. at 8. Petitioner was diagnosed with adhesive capsulitis and was advised to perform a home exercise program. *Id*.

Approximately seven weeks later, on February 27, 2020, Petitioner was examined by Dr. Colleen Linehan, an orthopedist affiliated with CCAO. Ex 9 at 8. For the first time, Petitioner complained of numbness and tingling in her left upper extremity. *Id*. Physical examination revealed normal strength and range of motion except for slightly decreased internal rotation. *Id*. Dr. Linehan concurred with PA Pilling regarding the interpretation of Petitioner's MRI and advised Petitioner to consider steroid injections if her pain continued. *Id*. at 9.

Despite Petitioner's reports of continued left shoulder pain, the record reflects that she did not seek out any additional treatment for another year. On February 9, 2021, Petitioner presented to nurse practitioner (NP) Megan Layton to establish a new primary care provider relationship. Ex 10 at 462. She now complained of left shoulder pain for two years, although her physical examination was normal. *Id*. at 465. Steroid injections were again discussed but Petitioner declined. *Id*. at 466. There is no evidence that Petitioner has received any additional treatment for her shoulder since this date.

In her initial affidavit, Petitioner alleged that the pain caused by her shoulder injury interfered with her sleep, activities of daily living (ADLs), and ability to exercise, which caused physical and emotional stress. Ex 2 at ¶¶ 7, 10-11, 13, 22-23. Her symptoms also interfered with her ability to care for her newborn. *Id*. at ¶¶ 7, 23, 24. In a supplemental affidavit dated August 23, 2021, Petitioner alleged that she continued to have difficulty

with ADLs and that her pain continued to interfere with her ability to exercise, sleep, and care for her now toddler-aged daughter. Ex 11 at ¶ 3, 6-9.

### 2. Comparison to Other Awards

The question in this case is not whether Petitioner is entitled to *any* compensation for her pain and suffering, but rather *what* amount of compensation is justified, based upon the facts of the case and considered relevant input. This determination is not an exact science but more of an art. While it is tempting to "split the difference" and award an amount halfway between the amounts proposed by the parties (acknowledging that in this case, the parties' respective positions reasonably "frame" high and low potential awards), each petitioner deserves an examination of the specific facts in his or her case. Thus, while amounts ultimately awarded may end up falling somewhere in the range between the awards proposed by both parties, this result flows from a specific analysis of Ms. Griffore's personal circumstances.

Overall, the record establishes that Petitioner has received limited, conservative treatment that is inconsistent with the severity and persistence of the symptoms alleged. This is not a case involving surgery. While her initial course of treatment was understandably limited by her pregnancy, Petitioner's daughter was born in July 2019,[13] yet she never returned to occupational or physical therapy, nor did she take prescription pain medication or receive more invasive treatment, such as injections, over the next two years. In fact, after relatively consistent, yet conservative, treatment over the course of the first year after vaccination, Petitioner has only complained of shoulder pain at one visit since February 2020, at which time she declined an offer of a steroid injection.

I am thus unpersuaded by Petitioner's argument that her injury is similar to, or even slightly worse than, those in the cases cited by Petitioner in support of her pain and suffering valuation. Those petitioners consistently rated their pain as ranging from 5-10/10, often on the higher end of this range,[14] while Petitioner *never* rated her pain as more than 4/10 (even without medication). Ex 1 at 25; Ex 3 at 3; Ex 7 at 3; Ex 8 at 6; Ex 9 at 8. In fact, the decisions in *Pruett*, *Capasso*, and *Kim* reflect that the pain and suffering awards were based in part on those petitioners' subjective reports of the severity of their pain as reflected in the medical records.[15] Additionally, these petitioners, when compared

---

[13] *See* Ex 10 at 65.

[14] *See Pruett*, 2019 WL 3297083, at *1-3; *Marino*, 2018 WL 2224736, at *2-3; *Capasso*, 2019 WL 5290524, at *3; *Kim*, 2018 WL 3991022, at * 1-2.

[15] *Pruett*, 2019 WL 3297083, at *9-10 (a factor considered in the petitioner's award was his initial severe pain); *Kim*, 2018 WL 3991022, at *8 (award contemplates the petitioner's initial period of significant pain after her SIRVA); *Capasso*, 2019 WL 5290524, at *11-12 (the petitioner's several-month initial history of severe pain is a factor in determining the award).

with the present case, had more severe findings on MRI, received more intensive treatment, and encountered difficulty when returning to their prior employment.[16]

At the same time, *Ramos* (one of the cases referenced by Respondent in his brief to support a lower award) also presents inapposite facts. The *Ramos* petitioner delayed seeking any treatment for four months. *Ramos*, 2021 WL 688576, at *2. Furthermore, while Petitioner can link her lack of more extensive care to her pregnancy, the *Ramos* petitioner had no such justification. Finally, in contrast with Petitioner's complaints of residual pain, the *Ramos* petitioner's pain had virtually resolved within seven months, and he ceased complaining of shoulder pain entirely within 11 months of vaccination.[17] *Id*. at *2-3.

Instead, Petitioner's case is more appropriately compared to *Magee*,[18] in which $65,000.00 was determined to be an appropriate award for pain and suffering. As Petitioner has emphasized, her SIRVA treatment and recovery were complicated by her pregnancy and her subsequent need to provide care for her newborn, an argument similar to that made in *Magee*, where the petitioner had a five-month-old at the time of her SIRVA. 2020 WL 5031971, at *2, 7. As with Petitioner, Ms. Magee promptly sought treatment and underwent a brief course of physical therapy, and her physical examination findings were within the "nearly normal" range within a year of her SIRVA. *Id*. at 1-2, 7.

Furthermore, while the *Magee* damages decision included a separate award for lost wages, the pain and suffering award also reflected consideration that the petitioner had to "alter her career path," an inclusion consistent with consideration of Petitioner's allegations regarding her work certification. *Id*. at 3, 8. Finally, both Petitioner and Ms.

---

[16] For example, in *Marino*, an MRI demonstrated evidence of mild to moderate tendinosis and a partial tear of the supraspinatus tendon, and the petitioner received a cortisone injection in her injured shoulder. 2018 WL 2224736, at *2-3. In *Capasso*, an MRI showed findings suggestive of partial thickness tearing of the infraspinatus tendon. 2019 WL 5290524, at *3. Furthermore, the petitioner in *Marino*, a nurse practitioner, was unable to perform some of her required job duties, including lifting and repositioning patients. 2018 WL 2224736, at 5, 7. Similarly, the petitioner in *Capasso* provided evidence showing he was only able to work at 50% of his prior capacity. 2019 WL 5290524, at *3. Petitioner has alleged that she allowed a work certification to lapse because she could not perform the physical maneuvers that were required as part of teaching the class. Ex 2 at ¶ 23. However, in contrast with the petitioners in *Capasso* and *Marino*, Petitioner has not provided corroborating proof of this assertion, nor has she established that teaching this class was an essential component of her job.

[17] Respondent also references *George* in his brief. ECF 35 at 10. While the petitioner's MRI in *George* showed mild findings similar to Petitioner's, the *George* petitioner underwent a cortisone injection and attended 30 sessions of physical therapy within the first eight months after her SIRVA. 2020 WL 4692451, at *2-3. This more intensive treatment renders *George* an inappropriate comparison.

[18] *Magee v. Sec'y of Health & Human Servs.*, No. 18-185V, 2020 WL 5031971 (Fed. Cl. Spec. Mstr. July 21, 2020).

Magee described in their affidavits a level of pain inconsistent with the contemporaneous medical records, which are generally accorded more weight than later-recorded testimony.[19] *Id.* at 7. Therefore, I find, consistent with *Magee*, that the records that do exist are not suggestive of a severe or prolonged injury, and that $65,000.00 for past pain and suffering is appropriate compensation in this case.

## V.     Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $65,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[20] I also find that Petitioner is entitled to $1,491.20 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $66,491.20 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[21]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[19] Special masters in the Vaccine Program have in most cases declined to credit later testimony over contemporaneous records. *See, e.g.*, *Stevens v. Sec'y of Health & Human Servs.*, No. 90–221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. Dec. 21, 1990); *Vergara v. Sec'y of Health & Human Servs.*, No. 08–882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. July 17, 2014) ("Special masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony."); *see also Cucuras*, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight").

[20] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[21] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.